IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


**WILLIAM LEE SHAFFER,**

     **Plaintiff,**

**vs.**                                                            **Case No.  1:13cv257-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

     This is a Social Security case referred to the undersigned magistrate judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It

is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner (Commissioner) of the Social Security

Administration (SSA) denying Plaintiff's applications for a period of disability and

Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act

(Act) and an application for Supplemental Security Income (SSI) pursuant to Title XVI of

the Act.  After consideration of the record, it is recommended that the decision of the

Commissioner be affirmed.

## I.  Procedural History

     On September 7, 2010, Plaintiff, William Lee Shaffer, filed an application for DIB.

R. 12, 76, 192.  (Citations to the record shall be by the symbol "R." followed by a page

number that appears in the lower right corner.)  On February 15, 2012, Plaintiff filed an application for SSI.  R. 12.  In both applications, Plaintiff alleged disability beginning October 20, 2009.  *Id.*  Plaintiff's date last insured for DIB is December 31, 2014.  *Id.*

Plaintiff's applications were denied initially on March 10, 2011, and upon reconsideration on July 5, 2011.  R. 12, 76-81, 89-90.  On July 20, 2011, Plaintiff requested a hearing.  R. 12.  On November 20, 2011, Plaintiff's counsel filed a request for an on-the-record decision.  R. 101-08.   On August 6, 2012, Administrative Law Judge (ALJ) Aaron M. Morgan held a video hearing with the ALJ presiding from Jacksonville, Florida, and Plaintiff appearing in Gainesville, Florida.  R. 12, 32-67. Plaintiff was represented by Elizabeth F. Stakenborg, an attorney.  R. 12, 32, 82-86, 98. Plaintiff testified.  R. 35-58.  Donna P. Mancini, an impartial vocational expert, testified. R. 12, 59-65, 159-60 (Resume), 276 (vocational expert's comments).

On August 28, 2012, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from October 20, 2009, through the date of the ALJ's decision.  R. 25.  On October 10, 2012, Plaintiff requested review of the ALJ's decision, R. 7, submitted a brief dated October 10, 2012, R. 279-88, and medical records from North Florida Regional Medical Center from June 17, 2007, through January 13, 2010, R. 703-19.  R. 5.  On November 29, 2013, the Appeals Council denied the request for review making the ALJ's decision the final decision of the Commissioner.  R. 1-6; *see* 20 C.F.R. § 404.981.

On December 20, 2013, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 16 and 19, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant has not engaged in substantial gainful activity since October 20, 2009, the alleged onset date." R. 14.

2. "The claimant has the following severe impairments: C5-6 disc herniation, arthritis, and obesity." *Id.*

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 16.

4. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never crawl or climb ropes, ladders, and scaffolds; only occasionally climb of ramps and stairs, balance, stoop, kneel, crouch, and reach overhead; and must avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights." R. 16.

5. "The claimant is unable to perform any past relevant work" as a truck driver, fuel delivery and tractor trailer truck driver, medium exertion level and semi-skilled work. R. 23.

6. "The claimant was born on November 2, 1958 and was 50 years old, which is defined as an individual approaching advanced age, on the alleged onset date." R. 24.

7. "The claimant has at least a high school education and is able to communicate in English." *Id.*

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* The representative occupations include marker, which is light, unskilled work; bar attendant, which is light and unskilled work; and a page/runner, shelving clerk, stack clerk, which are light, unskilled work. Each of these jobs has a specific vocational preparation (SVP) of 2. The ALJ considered, in part, the testimony of the vocational expert. R. 24, 60-62.[1]

---

[1] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). "Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components

9. "The claimant has not been under a disability, as defined in the Social Security Act, from October 20, 2009, through the date of" the ALJ's decision. R. 25.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[2]

---

of the Definition Trailer, § II, SVP. An SVP of 1 means a "[s]hort demonstration only." An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month." *Id.*

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[3] Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status. *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

---

[3] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, *e.g.*, 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

> 1.      Is the individual currently engaged in substantial gainful activity?
>
> 2.      Does the individual have any severe impairments?
>
> 3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?
>
> 4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]
>
> 5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

---

[4]  A residual functional capacity (RFC) is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  Id.  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c).

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R. § 401.1527.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  "'The

treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.' *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to

do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be

found when the opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks

persuasive weight," the opinion is "inconsistent with [the treating physician's own

medical records," the statement "contains no [supporting] clinical data or information,"

the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is

not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edward,

937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further,

where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight to the extent they are supported by clinical or laboratory findings and

are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler,

784 F.2d 1073, 1075 (11th Cir. 1986).

## IV.  The Evidence

Plaintiff was treated sporadically and conservatively from December 2004

through July 2009 by Bruce E. Thomas, M.D., and others, at Trenton Medical Center,

Inc./Palms Medical Group/Bell Family Healthcare.[5]  *See* R. 422-36, 686-702.  During

this time, he was treated, in part, for dermatitis, hypertension, nasal congestion, and

obstructive apnea.  R. 422-23, 425-35.  He was next treated by Dr. Thomas on

September 8, 2010.  Although the notes from this date are difficult to read, it appears

Dr. Thomas noted that Plaintiff was followed by Dr. Murphy--"had fusion C5-6."  R. 436,

689.  Chronic neck and lower back pain and follow-up with Dr. Murphy were noted.  *Id.*

---

[5]  The ALJ noted: "[T]he claimant has a treatment history with Trenton Medical
Center /Palms Medical Group; however, that treatment has been sporadic and
essentially conservative in nature.  Medical records show that the claimant was not
seen between 8/09 and 9/10 or between 3/11 and 12/11."  R. 21.

Plaintiff was next seen by Dr. Thomas in February 2011 for a medical examination to receive his Commercial Driver License (CDL), R. 690-92, and again in January 2012 for cold complaints, R. 686-88, 694. On June 25, 2012, Dr. Thomas filled out a Functional Capacity Evaluation. R. 702; *see infra* at 19-20.

On May 20, 2009, Plaintiff was treated at Lake City Medical Center emergency room for neck and back pain. R. 392-415; *see* R. 27. He reported being hit by a car from behind several days earlier, while driving a semi-truck. He had a stiff, sharp, neck and back pain that had worsened. A CT scan of the lumbar spine showed minimal disc bulges at L3-4 through L5-S1 and no acute findings. R. 411. There was no evidence of central canal stenosis or neural foraminal stenosis. Plaintiff was diagnosed with acute cervical and lumbosacral strain and totally incapacitated from work for three to five days until reevaluation. R. 393, 395, 415. A CT cervical without contrast showed mild to moderate degenerative spondylosis at C5-6 and C6-7. R. 412.

Plaintiff was treated once on May 27, 2009, by Phil Rhiddlehoover, M.D., an orthopedist. R. 332-33; *see* R. 17. Plaintiff complained of neck and low back pain. R. 333. Dr. Rhiddlehoover found that Plaintiff moved fluidly about the examination room; had a normal motor and sensory examination of the upper and lower extremities; had full range of motion (ROM) in the lumbar spine; had full ROM but with some pain in rotational movements and flexion and extension of the neck; and had a negative straight leg-raising. He was diagnosed with cervical and low back pain, referred to physical therapy for his back, and returned to full-duty status as Plaintiff felt he could accomplish his job. *Id.*

Plaintiff participated in physical therapy three times a week (ten times) through August 2009, R. 292-319, which Plaintiff reported did not help.  R. 291.  He was referred by "work comp" to Wagdi Faris, M.D., an orthopedist, for an orthopaedic evaluation. R. 290-91.  As of July 2009, Plaintiff had persistent posterior neck pain radiating to the shoulder blades and upper thoracic area.  He reported no arm pain, but he had numbness along the right hand, thumb, index and middle fingers.  He reported continuing to work driving a truck.  R. 291.  Examination revealed he was "quite overweight" at 310 pounds.  Neck rotation was 30 degrees to the right and the same to the left and extension was ten degrees and flexion was 20 degrees.  There were moderate spasms, probably 2+ on the back of the neck and trapezius muscles on both sides.  The right shoulder showed some pain on elevation of the right arm, but not limited.  His sensation was diminished on the thumb, index, and middle fingers of the right hand.  He walked without a limp and was not using any assistive devices.  He advised Dr. Faris that he had some low-back pain, but this subsided.  He was diagnosed with cervical sprain, probable cervical disc protrusion or herniation and referred for an MRI.  R. 290.  He was advised to quit smoking and to lose weight. R. 291.

On July 27, 2009, Plaintiff had a MRI of the cervical spine.  R. 326.  He had difficulty holding still during breathing difficulties.  The MRI showed a spondylitic bulge at C5–6 and a protrusion paracentral to the left that was impinging upon the left C6 nerve root, almost touching but not deforming the ventral cord.  *Id.*  (Plaintiff was treated for diabetes in July 2009.  R. 434-35.)

On August 17, 2009, Plaintiff underwent a workers' compensation examination performed by Dr. Faris. R. 289. Plaintiff's symptoms included neck pain, numbness along the right thumb, index, and middle fingers on the volar aspect which could be related to carpal tunnel. He also complained of burning and numbness along both feet and ankles. Dr. Faris reported that Plaintiff's back was not tender, that the straight leg-raising was negative, that his motor power was intact, and that his sensation was adequate. He had good peripheral pulse on the lower extremities. A cervical spine MRI revealed a protruding disc at C5-6. Plaintiff was also diagnosed with probable carpal tunnel syndrome of the right hand and numbness on both feet and ankles, which could be related to diabetes. Plaintiff continued to work. *Id.*

Plaintiff continued to experience significant neck pain and on October 20, 2009, Steven A. Reid. M.D., a neurosurgeon, provided a neurological consultation and examined Plaintiff. R. 367-69, 676-78; *see* R. 18. Dr. Reid reported that Plaintiff's chief complaint was neck pain radiating into his shoulders and arms, worse on the left side, and a secondary complaint of low back pain. R. 367. His symptoms did not respond to physical therapy and medications. He reported experiencing excruciating pain while driving because of the bouncy ride in his vehicle. He reported he saw Dr. Faris who recommended surgical treatment. *Id.* He also reported numbness and tingling affecting both arms, hands, legs, and feet. He reported he had no prior episodes of neck pain prior to his May 2009 accident. He reported intolerance to codeine and aspirin, but he currently took Lisinopril, Metroprolol, and Metformin. *Id.* Examination revealed, in part, that he was morbidly obese and had mild bilateral venous stasis changes in his distal legs and feet. R. 368. Neck exam revealed a full ROM. *Id.* Neurologic exam was

normal.  Cervical foraminal closure maneuvers elicited left cervicobrachial brachial pain and motor examination revealed weakness of the left grip and biceps.  His gait and station appeared normal.  Straight leg-raising did not elicit sciatica.  He was advised to undergo surgery at C5-6.  R. 368-69.

On December 14, 2009, Wilda Murphy, M.D., completed an evaluation for workers' compensation and examined Plaintiff.  R. 554-59; *see* R. 18.  Plaintiff reported having neck and back pain and was referred for surgery.  He described pain in the front part of his knees with some tenderness.  He had increased pain with walking activities, left greater than right, and had pain in the medial aspect of the knees.  Plaintiff had numbness of his feet, ankles, hands and arms.  Examination revealed he was morbidly obese with a BMI of 41 and had mild difficulty raising from a chair.  His gait was non-antalgic.  R. 556.  He lacked five to ten degrees of extension to the left knee secondary to tightness of hamstrings and there was crepitus with ROM of the knees, primarily on the left.  *Id.*  He was diagnosed with bilateral knee pain and morbid obesity.  Plaintiff suffered from underlying arthritis exacerbated by contusion to his knees after the automobile accident.  R. 557.  He was currently out of work and restrictions consisted of no heavy carrying, avoiding kneeling and squatting due to his knees only.  *Id.*

On January 11, 2010, Plaintiff underwent bilateral x-rays of his knees.  R. 551.  X-rays showed tricompartmental chondromalacia with mild to moderate osteoarthritic changes seen involving the left patellofemoral and lateral compartments and mild osteoarthritic changes involving the patellofemoral and medial compartments.  *Id.*

From January 2010 through April 2010, Dr. Reid treated Plaintiff for intractable cervicobrachial pain.  R. 373-87.  On January 13, 2010, Plaintiff underwent a C5-6 anterior microsurgical discectomy, osteophytectomy, and allograft arthrodesis. R. 382-86, 681-85; *see* R. 18.  His post-operative diagnosis was C5-6 herniated nucleus pulposus with radiculopathy.  R. 383.  Progress notes dated February 25, 2010, indicate that Plaintiff complained of low back pain and occasional cramps and pain radiating into his lower extremities.  He also reported relief with his radiating upper extremity pain and his hand pain, numbness, and tingling.  Dr. Reid indicated that Plaintiff had mild lumbar myospasm.  R. 376, 674.  Dr. Reid stated Plaintiff could return to work on light duty status, but needed to keep his collar on at all times and refrain from lifting anything over 20 pounds.  Physical therapy was prescribed.  R. 376-77.  On March 29, 2010, Dr. Reid reported that Plaintiff had resolution of his upper extremity symptoms after undergoing neck surgery in January 2010.  Plaintiff reported occasional low back pain and occasional tingling in his legs.  An examination revealed intact strength and sensation throughout.  R. 375.

On April 13, 2010, Dr. Reid examined Plaintiff and noted Plaintiff's report of good relief of his neck and upper extremity symptoms.  Plaintiff complained of low back pain and upon examination Dr. Reid determined that Plaintiff had mild lumbar myospasm and in a straight leg raising elicited bilateral hip pain at 60 degrees.  Plaintiff remained off work at this time.  A lumbar spine MRI was ordered.  R. 373-74.

On April 28, 2010, Dr. Reid examined Plaintiff and reported that he had no complaints pertaining to his neck or upper extremities.  Plaintiff continued to experience low back pain with pain radiating to his hips.  Dr. Reid noted that Plaintiff's gait and

station appeared normal and that Plaintiff's MRI of the lumbar spine showed no neural

compressive pathology.  R. 669-70.  He released Plaintiff to return to work in full

capacity with the exception of avoiding overhead work and referred him to a physiatrist

for management of his low back pain.  R. 670; *see* R. 18.

From February 2010 through September 2010, Dr. Murphy treated Plaintiff.

R. 531-53.  On February 9, 2010, Plaintiff presented with bilateral knee pain.  R. 552-53.

Examination revealed he was overweight and his pressure was elevated.  He was

wearing a cervical collar and had crepitus with ROM of both knees, left greater than

right, and with left knee extension, he had five to ten degrees due to tight hamstrings.

He was diagnosed with bilateral knee pain with tri-compartmental chondromalacia with

mild to moderate osteoarthritic changes, left greater than the right.  *Id.*  On March 23,

2010, Plaintiff presented with knee pain associated with underlying arthritis.  R. 547-48.

He started physical therapy which was helpful, but he was still having difficulty

negotiating stairs due to knee pain.  Examination revealed a slow gait mild tenderness

to the popliteal fossa on the left and not on the right; medial joint line tenderness on the

right; and lateral joint line tenderness on the left.  *Id.*  On May 18, 2010, examination

revealed continued knee pain.  R. 543-44.  Plaintiff had completed 16 visits with

physical therapy and had been discharged as he achieved functional ROM and

strength.  R. 534.  Plaintiff had lost 82 pounds since the accident and acknowleged it

had a positive impact regarding his knee pain.  His strength improved grossly to 5/5.  *Id.*

Examination revealed a slight limitation in the extension bilaterally and mild joint line

tenderness with no effusion, and mild crepitus on ROM with significant crepitus on the

right.  He underwent steroid injections to both knees.  R. 544.  Dr. Murphy noted that

Plaintiff "has done well after conservative treatment with PT and weight loss.  He has no restrictions to his knees." *Id.*; *see* R. 19.

On July 23, 2010, Plaintiff reported to Dr. Murphy that he had pain in the base of his neck referring to the upper thoracic region and axial low back pain.  R. 537-42.  His symptoms were continuous, severe, dull, sharp, pressure-like and throbbing.  Range of motion of his neck, sitting, standing, driving, twisting, bending, and laying down and lifting worsened his pain.  Moving around made the pain better.  Examination revealed his gait was slow but non-antalgic and he had increased muscle tone primarily to the left upper trapezius muscle.  He was guarded with ROM of the cervical spine in all planes with ROM at least 50 percent of normal range.  Flexion of the lower spine was at 60 degrees with limited extension of five degrees.  Otherwise, he had full ROM x4 extension.  He had diminished pinprick to his arms and forearms bilaterally except for his hands.  His motor strength was good x4 extension.  R. 539.

On July 23, 2010, Dr. Murphy completed a functional limitations and restrictions form regarding Plaintiff's condition.  R. 542.  Plaintiff was diagnosed with neck and back pain, underwent physical therapy, and was to avoid repetitive overhead activities. Dr. Murphy added a new restriction for Plaintiff's low back to avoid heavy lifting above 50 pounds.  R. 540, 542.  MMI was anticipated in two months and it was not determined whether a residual clinical dysfunction or residual functional loss was anticipated for the work-related injury.  R. 542.

Plaintiff had no improvement with his medications and Vicodin was not very helpful for his pain as of August 20, 2010.  R. 533.  Examination revealed his gait was slow and antalgic and he had stiff posture to his neck.  Plaintiff also had increased

muscle tone to thoracolumbar paraspinals bilaterally and a mild element of scoliosis secondary to muscle spasms.  Otherwise, he had good ROM of his extremities.  *Id.*  He was told to increase his Lyrica dose, his Vicodin was changed to Lortab, was started on Robaxin, and he was to continue physical therapy.  *Id.*  Progress notes dated September 3, 2010, reveal side effects from increased Lyrica dosage and shortness of breath.  R. 531-32.  Plaintiff had no pain in his knees.  Examination revealed his gait remained slow, but less antalgic.  He maintained stiff posture to his neck.  He had good ROM of his knees.  His knee still had very limited extension and crepitus but no joint line tenderness, no effusion.  He switched to Percocet and was approved for additional physical therapy to the cervical spine.  Lyrica was discontinued.  *Id.*  Plaintiff continued to be treated for diabetes and hypertension in September 2010 by Palms Medical Group.  R. 436.

On October 1, 2010, Plaintiff reported to Dr. Murphy having continuing difficulty with neck pain.  R. 525-27.  He was still attending physical therapy and was having difficulty with strengthening exercises to the upper extremities.  R. 526.  He also still had ongoing low back pain with burning sensation that would occasionally go down his legs, but primarily occurred with standing and walking.  Examination revealed decreased ROM of the cervical spine with lateral rotation to 30 degrees.  Plaintiff was unable to touch his chin to his chest and cervical motion was limited.  He had mild tightness to the right upper trapezium and slightly limited ROM of his shoulders, right more than left.  He also had diffuse tenderness of his lumbar spine.  Dr. Murphy had a six percent permanent impairment rating of the cervical spine for surgically treated disc lesion.  Since he had his C5-6 single level fusion, his impairment had increased by one percent

Case 1:13-cv-00257-MP-CAS   Document 20   Filed 08/13/14   Page 18 of 31

Page **18** of **31**

for a total of seven percent and for lumbar pain associated to chronic muscle spasms, he was assigned a three percent permanent impairment rating.  *Id*.  His permanent restrictions were to avoid repetitive overhead activities and no lifting above 50 pounds. R. 527.

On October 29, 2010, Plaintiff appeared wearing a cervical collar and reported having exacerbation of axial pain going down to the upper back area.  He also complained of pain between his shoulder blades.  Dr. Murphy noted Plaintiff had reported that back therapy helped and that he was not having any radicular symptoms. R. 590.  A musculoskeletal exam revealed no focal muscle spasms to the CT paraspinals but rather more diffuse tenderness to palpation to that area as well as the rhomboids.  Plaintiff's ROM was slightly diminished, but unchanged from a prior exam with abduction fully to 90 degrees.  Dr. Murphy noted that Plaintiff had guarded ROM of the cervical spine.  Plaintiff had no focal weakness to his upper extremities with MMT. *Id*.  Plaintiff was prescribed a trial of Baclofen, continued on Ibuprofen (which he tolerated) and Percocet as needed, and to discontinue Robaxin.  Plaintiff was advised to continue home exercise program and to continue his efforts toward weight loss with his current weight at 276 pounds.  R. 591.

On February 9, 2011, at the request of the state disability agency, Plaintiff was examined by Diana M. Benton, Psy.D., a psychologist.  R. 618-22.  Plaintiff reported arthritis in both knees, a back injury, neck injury, shoulder, back, hip, leg, and foot pain. R. 618.  Plaintiff explained that he had a limited ability to turn his head in all directions, was limited in lifting and overhead work, and suffered from depression.  *Id*.  Plaintiff described difficulty buttoning buttons but was able to do limited cleaning.  R. 619-20.

The mental status examination revealed Plaintiff had patches of cement on his knuckles which he reported was a permanent situation as a result of exposure to cement dust he delivered for several years.  He was morbidly obese.  His upper back was somewhat stooped and his head was forward relative to his torso.  He appeared to turn his head only by turning his entire torso and pain behaviors included periodically rearranging his position.  There was no evidence of involuntary movements.  R. 620.  His mood was dysthymic and congruent.  His though processes were logical and goal-oriented.  There was no evidence of perceptual abnormalities.  He was well-oriented to person, place, and time.  R. 621.  His judgment and insight were "grossly intact."  *Id.*

Dr. Benton diagnosed Plaintiff with generalized anxiety disorder.  *Id.*  Dr. Benton recommended that a qualified physician be enlisted to comment on Plaintiff's physical limitations and the impact that these may have on the prognosis for his ability to perform different types of work.  "Regarding his ability to perform various work related mental activities, he appears to have adequate capacity in the areas of understanding and memory, concentration, persistence, social interaction and adaptation to perform work for which he is suited.  Should anxiety symptoms persist, he may benefit from psychopharmacological evaluation."  *Id.*

On February 16, 2011, Dr. Thomas, completed a Medical Examination Report for Commercial Driver Fitness Determination recertification.  R. 690-92; *see supra* at 9 (Dr. Thomas's treatment of Plaintiff in 2004-2009).  Plaintiff certified, in part, that he did not have chronic low back pain, that he had no spinal injury, indicated "no" for diabetes, and that this information was complete and true.  Dr. Thomas's name and affiliation are provided with the following: "(no limitations)."  R. 690.  (Plaintiff indicated he had high

blood pressure and was taking medication.  Dr. Thomas stated his "blood pressure is well controlled with meds." *Id.*)  Dr. Thomas reported (by check marks) that Plaintiff did not have any extremities, spine, or other musculoskeletal abnormalities and no previous surgery, deformities, limitation of motion, or tenderness.  He also indicated (by a check mark) that Plaintiff met the regulatory standards and qualified for a two-year certificate. R. 692.[6]

On June 22, 2011, at the request of the state disability agency, Lance I. Chodosh, M.D.,  examined Plaintiff as part of a disability determination.  R. 647-54. Plaintiff provided a history of his present problems.  R. 647.  He reported arthritis in his knees, and a neck and back injury with pain in his neck, shoulders, thighs, hips, legs, feet and reported depression.  Examination revealed he was obese and slightly unhealthy appearing.  R. 648.  There was one plus pitting edema in the lower legs and ankles.  Straight leg-raising was limited to 80 degrees bilaterally while in the supine position and limited by tight hamstrings and negative to 90 degrees bilaterally while sitting; and pin sensation was decreased on the medial aspects of both ankles.  R. 649. He had decreased ROM of the cervical spine with lateral flexion, extension, and rotation.  Dr. Chodosh reported that Plaintiff's shoulder, knee, ankle, elbow, wrist, hand, ankle, hip, and lumbar spine ranges of motion were normal.  R. 651-52.  He declined to squat and rise as he was advised not to.  R. 647-649. Addressing Plaintiff's functional

---

[6]  As noted later, *see infra* at 21-22, the conclusions reached in this report are far different from Dr. Thomas's June 25, 2012, functional capacity evaluation.  R. 702.  The ALJ considered Dr. Thomas' February 16, 2011, report, R. 20, and his June 25, 2012, evaluation, R. 21.  Although noting that he was Plaintiff's primary care physician, the ALJ gave Dr. Thomas's opinion "little weight" in light of Plaintiff's "sporadic and essentially conservative" treatment history with Trenton Medical Center/Palms Medical Group.  R. 21-22.  The ALJ also noted that Plaintiff "has reported activities of daily living which are in excess of Dr. Thomas's limitations (Exhibits 4E, 6E, and 18F; hearing testimony)."  R. 22.

status, Dr. Chodosh indicated that Plaintiff could perform activities of daily living without assistance, could walk a mile at a time relatively well; and stand comfortably for 30 minutes without resting; could sit in one position for 20 minutes; he could bend over at the waist in limited fashion; he could lift 50 pounds but could not lift objects overhead; had some difficulty grasping objects; and had some difficulty with very fine motor activity with his right hand.  R. 647.  Dr. Chodosh also indicated that Plaintiff's motor function was grossly normal in all four extremities with 5/5 strength throughout and that his gait and standing balance were normal.  R. 649.  Plaintiff was diagnosed with obesity, chronic neck and back pain of uncertain etiology, without physical signs of significant impairment; prominent breathing pattern probably reflecting obesity, some smoking-related damage, and probable upper airway obstruction; probable obstructive sleep apnea; and knee pain.  R. 650.  Based only on objective evidence, Plaintiff was able to stand, walk, sit, and bend at the waist.  He can probably squat occasionally and can kneel; "[h]e can lift and carry occasionally, limited by probable lack of stamina"; he can handle objects and he can hear and speak normally.  *Id.*; *see* R. 20.

On July 5, 2011, state agency medical consultant, Shakra Junejo, M.D., reviewed Dr. Chodosh's June 22, 2011, medical report, and other medical evidence indicating that Plaintiff's lumbar spine MRI revealed no impingement and that he was released for light duty on February 25, 2010.  R. 663.  Dr. Junejo noted that Dr. Chodosh reported that Plaintiff could walk a mile, lift 50 pounds, but not overhead, that he was independent with his activities of daily living, and that his gait and balance were normal. Dr. Junejo also reported that Plaintiff's October 2010 lumbar spine MRI indicated no impingement.  *Id.*  Dr. Junejo completed a Physical Residual Functional Capacity

Assessment and reported that Plaintiff could lift and/or carry up to 20 pounds occasionally and ten pounds frequently; could sit and stand and/or walk about six hours in an eight-hour workday; and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds.  R. 657-58.

On the June 25, 2012, Dr. Thomas saw Plaintiff and completed a Functional Capacity Evaluation.  R. 702.  The lifting/carrying part of the form is difficult to read because it appears Dr. Thomas placed a check mark in two boxes (can lift and/or carry twenty pounds occasionally and ten pounds frequently; can lift and/or carry ten pounds occasionally and five pounds frequently) and also circled the box indicating that Plaintiff can lift and/or carry ten pounds occasionally and five pounds frequently.  *Id.*  Plaintiff did not submit any clarification from Dr. Thomas.  To the right of these boxes is the following explanation: "causes pain in lower back and shoulders."  *Id.*

Dr. Thomas also indicated that during an eight-hour workday, Plaintiff could only sit for four hours and stand or walk for one hour total and must periodically alternate between sitting and standing every 15 to 20 minutes.  *Id.*  It would be expected that Plaintiff would be absent from work more than four days per month and that during a typical workday, Plaintiff's pain or other symptoms would frequently become severe enough to interfere with his attention and concentration need to perform even simple work tasks.  Plaintiff would also require periods of time when he must lay down or elevate his legs to alleviate pain.  Plaintiff should never work with or around hazardous machinery and rarely bend or stoop.  He could occasionally reach, climb and balance, operate motor vehicles, push and pull the arm and/or leg controls, and engage in gross and fine manipulation.  *Id.*  Dr. Thomas concluded his evaluation by noting that the

medical basis for these restrictions included neck pain, status post cervical spine surgery, and arthritis of the lower spine and knees and that these restrictions applied as of June 2011.  *Id.*; *see supra* n. 6 (ALJ's assessment of Dr. Thomas's opinion).

## V. Legal Analysis

### Substantial evidence supports the weight the ALJ accorded to the opinions of Dr. Chodosh and Dr. Thomas and further supports the ALJ's consideration of Plaintiff's alleged inability to afford medical treatment.

Plaintiff argues first that the ALJ erred because he did not explain the weight he accorded to Dr. Chodosh's opinion and failed to explain why he did not credit part of Dr. Chodosh's opinion that Plaintiff "can lift and carry occasionally, limited by probably lack of stamina," R. 650.  Doc. 16 at 10-14.  Second, Plaintiff argues that the ALJ erred when he did not appropriately credit Dr. Thomas's opinion.  Doc. 16 at 14-17.  Third, the ALJ also erred when he noted Plaintiff had no insurance and could not afford appropriate medical treatment and/or medication, but suggested there were state and federal agencies that were available to assist individuals with needed medical treatment and medications. Doc. 16 at 11-12.

Regarding Plaintiff's ability to lift and carry and Plaintiff's overall RFC, the ALJ discussed the relevant medical opinions in the record and found that Plaintiff's limitations did not preclude him from performing light work.  In making this determination, the ALJ also considered Plaintiff's hearing testimony and pre-hearing statements.  R. 17, 22-23.

Relevant here, the ALJ thoroughly discussed the results of Dr. Chodosh's consulting examination of Plaintiff, which is generally consistent with the patient notes of treating physicians, save Dr. Thomas.[7]  R. 20.  For example, on May 27, 2009, Dr. Rhiddlehoover reported that Plaintiff had a normal motor and sensory examination of the upper and lower extremities, that he had a full ROM in the lumbar spine, a negative straight leg-raising, and that he could return to full-duty work status.  R. 333. On August 17, 2009, Plaintiff underwent a workers' compensation examination performed by Dr. Faris.  R. 289.  Dr. Faris reported that Plaintiff's back was not tender, that the straight leg-raising was negative, that his motor power was intact, and that his sensation was adequate.  *Id.*  On October 20, 2009, Plaintiff was examined by Dr. Reid. R. 367-69, 676-78.  By February 25, 2010, Plaintiff returned to Dr. Reid's office following on his January 13, 2010, cervical surgery.  R. 376-77.  Dr. Reid noted: "Examination today revealed unremarkable vital signs as documented on our progress note.  The surgical scar appeared well healed and nontender.  He had intact strength and sensation.  He had mild lumbar myospasm.  I concluded his progress appears generally satisfactory.  I prescribed physical therapy.  I released him for light duty work. I scheduled followup in one month."  R. 376.  On the same date and in a separate note, Dr. Reid also noted that Plaintiff could return to work on a light duty status although he must keep his collar on at all times and refrain from lifting anything over 20 pounds.  R. 377.  On April 28, 2010, Dr. Reid noted that Plaintiff had made a good recovery from the

---

[7]  Dr. Chodosh reported, in part, that Plaintiff's motor function was grossly normal in all four extremities with 5/5 strength throughout and that he could lift 50 pounds but could not lift objects overhead.  R. 647, 649.  State agency medical consultant, Dr. Junejo specifically noted that Dr. Chodosh found that Plaintiff could lift 50 pounds. R. 663.  Based on his review of the medical evidence of record, Dr. Junejo determined that Plaintiff could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently.  R. 657-58, 663.

cervical spine surgery and further noted that he "released him to return to work in full capacity with the exception of avoiding overhead work."  R. 670.

The ALJ considered the April 28, 2010, opinion of Dr. Reid, R. 669-70 (Exhibit 22F at 1 and 2), Plaintiff's treating neurosurgeon, and gave "it great weight."  R. 21. The ALJ stated:

> The undersigned notes that Dr. Reid has a treatment history with the claimant and his opinion is supported by objective medical findings, including no obvious cranial nerve, higher cortical function, memory, language, or cerebellar abnormalities; normal fund of knowledge; well-healed and non-tender surgical scar; normal gait and station; no neural compressive pathology of the lumbar spine per MRI; and good recovery from cervical spine surgery (Exhibit 22F/1). Furthermore, Dr. Reid is a Board Certified Neurological Surgeon.  As stated above, the undersigned notes that, at the hearing, the claimant testified to only taking over the counter medications for pain.

R. 21.

Dr. Murphy evaluated Plaintiff beginning on December 14, 2009.  R. 554-59. Plaintiff was subsequently examined and treated by Dr. Murphy (Plaintiff's treating pain specialist) on several occasions.  For example, on July 23, 2010, Dr. Murphy completed a functional limitations and restrictions form regarding Plaintiff's condition.  R. 541-42. Plaintiff was diagnosed with neck and back pain, underwent physical therapy, and was to avoid repetitive overhead activities and he was limited to no lifting above 50 pounds. R. 542.  On October 1, 2010, Plaintiff reported to Dr. Murphy having continuing difficulty with neck pain.  R. 525-27.   Plaintiff received several impairment ratings and his permanent restrictions were to avoid repetitive overhead activities and no lifting above 50 pounds, R. 527, assessments noted by the ALJ, R. 20.  In fact, the ALJ, referring to Dr. Murphy's October 1, 2010, assessment, *see* R. 562 (Exhibit 11F at 3), gave Dr. Murphy's opinion "great weight."

The undersigned notes that Dr. Murphy has a treatment history with the claimant and his opinion is supported by objective medical findings, including slow, but less antalgic gait; decreased cervical lateral rotation and extension; mild tightness to right upper trapezium, but without discrete trigger points; slight limited range of motion of shoulders; slight increase in lumbar lordosis with diffuse tenderness throughout lumbar paraspinals; decreased lumbar flexion and extension; and negative straight leg raises.  The claimant was doing better and only taking pain medications as needed, rather than daily.  He was given a combined permanent impairment rating only 8% for the cervical and lumbar spine (Exhibit 11F/2-3).  Furthermore, the claimant reported only taking Percocet on an as needed basis and could go days without it; took OTC Aleve.  He stated that his pain was worse towards the end of the day, but he was able to stay active throughout the day (Exhibit 11F/1). Furthermore, Dr. Murphy is Board Certified in Physical Medicine and Rehabilitation. The undersigned also notes that, at the hearing, the claimant testified to only taking over the counter medications for pain.

R. 21.

The ALJ considered the opinion of Dr. Thomas, Plaintiff's primary care physician, and gave "it little weight," and provided a detailed explanation.  R. 21-22.  The ALJ considered medical records from Trenton Medical Center/Palms Medical Group (where Dr. Thomas saw Plaintiff) covering the period May 2009 through January 2012 and further noted that the treatment was sporadic and conservative.  R. 20-23; *see supra* n. 5.  Plaintiff does not dispute this finding.  Plaintiff also does not dispute the ALJ's finding that Dr. Thomas's extreme limitations were inconsistent with his own assessment that Plaintiff met the standards and qualified for a two-year commercial driver's license with the medical evidence from the Trenton Medical Center/Palms Medical Group that did not document treatment for complaints of back, knee, or neck pain, and with Plaintiff's own reported activities of daily living.  R. 22, 692.

After discussing the relevant evidence, the ALJ further stated that his RFC assessment was supported by record evidence and the ALJ summarized the evidence. R. 22-23.

In sum, the above residual functional capacity assessment is supported by the following.  First, the claimant has described daily activities, which are not totally limited and that are consistent with the residual functional capacity found in this decision.  The undersigned notes that, at the hearing, the claimant testified that his wife did all the household activities; however, the undersigned does not find this entirely credible as his wife is disabled.  Furthermore, at one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: applying for jobs, taking care of personal needs, preparing light meals, doing laundry, loading/unloading dishwasher, being able to walk a mile at a time and lift 50 pounds, driving (drove 39 miles to the hearing), shopping and carrying groceries, managing finances, and watching television, (Exhibits 4E, 6E, and 18F; and hearing testimony).

Furthermore, as mentioned earlier, the record reflects work activity after the alleged onset date.  Although that work activity did not constitute as substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported (Exhibits 3D and 5D, and hearing testimony).  The undersigned also notes that the claimant received unemployment compensation benefits from the 4th quarter of 2010 through the 1st quarter of 2012 (Exhibits 3D and 5D).  By accepting these benefits, the claimant acknowledges that he is ready, willing, and able to work.  The receipt of unemployment benefits also demonstrates a certain level of functioning because the claimant had to make regular reports to the state and search for jobs in order to qualify.

Second, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual and the record reflects significant gaps in the claimant's history of treatment.  Medical records show that the claimant was involved in a work-related MVA in May of 2009; however, he continued to work until October of 2009.  In January of 2010, he underwent a cervical anterior microsurgical diskectomy, which improved his symptoms.  Following surgery, he was followed both by a neurosurgeon and pain management specialist.  In April of 2010, only four months after the claimant's AOD, his neurosurgeon released him to return to work in full capacity with the exception of avoiding overhead work.  Furthermore, in October of 2010, one year after the claimant's AOD, his pain specialist released him to work with permanent restrictions to avoid repetitive overhead activities an [sic] no lifting over 50 pounds (Exhibits 1F-4F, 6F, 10F, 11F, 13F, and 22F).  Since October of 2010, the claimant's treatment has been through his primary care physician.  Furthermore, that treatment has been essentially conservative in nature.  The evidence of record shows that the claimant has only seen his primary care physician on two occasions after October of 2010; once in February of 2011 for a medical examination to receive his CDL license, which he passed; and one in January of 2012 for cold complaints (Exhibits 8F, 23F, and 24F).  The evidence of record also shows that the claimant has not received any recent physical therapy or injections.  Furthermore, the record documents improvement in

symptoms with physical therapy (Exhibits 10F/20 and 24, and 12F/5) and injections (Exhibit 10F/8).  The undersigned also notes that the claimant's use of medications does not suggest the presence of impairments, which are more limiting than found in this decision.  The claimant is only taking over the counter medications for pain (Exhibits 19E, and 10F/2 and 12; and hearing testimony).

In the record and at the hearing, the claimant has reported not being able to afford appropriate medical treatment and/or medication due to lack of finances and/or no insurance; however, the undersigned notes that there are State and Federal Agencies available to help individuals with both medical treatment and medications.  At the hearing, the claimant also testified to using a cane for balance; however, it was not prescribed.  The undersigned notes that there is no evidence in the record documenting the need for an assistive device.  Furthermore, in June of 2012, Dr. Thomas stated that the claimant did not require the use of an assistive device for ambulation (Exhibit 25F).

Third, the description of symptoms and limitations, which the claimant has provided throughout the record, has generally been inconsistent and unpersuasive.  Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance and demeanor while testifying at the hearing.  It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.  The undersigned also notes that the record contains a statement from two treating specialists releasing the claimant to return to work (Exhibits 11F/3 and 22F/2).  Furthermore, the residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also support a finding of 'not disabled.'  Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions.  These physicians concluded that the claimant could perform a restricted range of light work (Exhibits 1A and 20F).

R. 22-23.

In finding that Plaintiff retained the RFC to perform a restricted range of light work, the ALJ discussed Plaintiff's physicians' findings regarding his ability to lift and carry, noting that he was limited to lifting between 20 pounds to 50 pounds and no heavy carrying.  R. 18-22.  The ALJ also noted that Plaintiff was returned to work at full capacity with permanent restrictions to avoid repetitive overhead activities and that he

met physical standards and qualified for a two-year commercial driver's license.  R. 18-19, 22-23.

Regarding Plaintiff's ability to lift and carry, the ALJ referred to Dr. Junejo's report, who in turn referred to Dr. Chodosh's medical findings that Plaintiff could lift 50 pounds, and concluded that Plaintiff could perform a restricted range of light work. R. 23, 663.  Plaintiff does not dispute or otherwise challenge the ALJ's evaluation of Dr. Junejo's report or the ALJ's determination that that there existed a number of other reasons to reach conclusions similar to that of Dr. Junejo.  The ALJ considered and weighed the medical evidence of record, which included Dr. Chodosh's report and credited the reports to the extent that Plaintiff's ability to lift and carry corresponded with a restricted range of light work.  No error has been shown.

Finally, Plaintiff argues that he did not have insurance and that the ALJ should have presented evidence that there were more options for Plaintiff to obtain medical care and prescriptions.  Doc. 16 at 16-17.  The ALJ noted in his decision that Plaintiff reported not being able to afford appropriate medical treatment and/or medication due to lack of finances and/or no insurance.  The ALJ noted, however, that there were state and federal agencies available to help individuals with both medical treatment and medication and further noted that Plaintiff was taking over-the-counter medication for pain.  R. 23; *see generally* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining that ALJ properly discounted complaints of disabling pain where, among other factors, claimant only took aspirin, Motrin, Tylenol, and Darvocet).  Again, the ALJ properly considered Plaintiff's allegations regarding alleged lack of finances or insurance in order to obtain medical treatment.  It remained, however, Plaintiff's burden

to present evidence that he attempted to obtain assistance or that he was prevented from obtaining care due to lack of insurance.  Plaintiff did not present evidence that he sought out low-cost medical treatment, but that he was denied treatment due to lack of finances.  *See* Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).  To the contrary, Plaintiff testified at the hearing that he was able to get over-the-counter medication that helped him and his doctor at the Palms Group arranged for him to pay $10 every visit and $10 for his heart and high blood pressure medicine.  He goes once a month.  R. 47-48.  Substantial evidence supports the ALJ's consideration of Plaintiff's alleged inability to afford medical care and treatment.[8]

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it

---

[8]  Plaintiff testified he was discharged from physical therapy.  The physical therapist told him that there was nothing else they could do, "that [his] condition is not going to change."  R. 54.

is respectfully recommended that the decision of the Commissioner to deny Plaintiff's

applications for Social Security benefits be **AFFIRMED.**

      **IN CHAMBERS** at Tallahassee, Florida, on August 13, 2014.


                  **s/ Charles A. Stampelos**
                  **CHARLES A. STAMPELOS**
                  **UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**