## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**WILLIAM LEE SHAFFER,**

      **Plaintiff,**

**vs.**                                    **Case No.  1:13cv257-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION AFTER RECOMMITTAL</u>

This matter is before the Court on an Order, doc. 22, in which Senior District

Court Judge Maurice M. Paul recommitted the matter to the undersigned with

instructions to "consider and explain with specificity whether the [Administrative Law

Judge] ALJ sufficiently explained with particularity the weight accorded to the opinion of

Dr. Chodosh and the reasons therefor.  If the Magistrate Judge finds that the ALJ failed

to satisfy this standard, the Magistrate Judge shall consider and explain with specificity

whether such error was harmless." *Id.* at 8.  The parties filed supplemental

memoranda, docs. 24 and 25, which have been considered.

Plaintiff, William Lee Shaffer, sought review from an adverse decision rendered

by the ALJ and the Appeals Council.  Doc. 1.  Plaintiff raised three issues for

consideration by the undersigned: "(1) whether the Administrative Law Judge ("ALJ")

failed to explain the weight accorded to the opinion of Dr. Chodosh and the reasons for

not crediting the portion of that opinion regarding the frequency of Plaintiff's ability to lift

and carry; (2) whether the ALJ failed to articulate good cause for not crediting the

opinion of Dr. Bruce Thomas; and (3) whether the ALJ erred in his analysis of Plaintiff's

ability to afford medical care and/or prescription medication."  Doc. 22 at 1-2; *see* doc.

16.  With respect to the second and third issues, the Court adopted the Report and

Recommendation, which decided these issues adverse to Plaintiff, and the Court stated:

> Concerning the second issue, the Court agrees that, for the reasons stated in the
> Report and Recommendation, good cause existed for the ALJ to discount the
> opinion of Dr. Thomas, Plaintiff's primary care physician.  The ALJ found that
> Plaintiff's treatment with Dr. Thomas was sporadic and essentially conservative
> in nature.  The ALJ also found that Dr. Thomas' findings were not consistent with
> (1) his own assessment regarding Plaintiff's qualifications for a two-year
> commercial driver's license, (2) the medical evidence from the Trenton Medical
> Center/Palms Medical Group, and (3) Plaintiff's own reported activities of daily
> living. Plaintiff does not dispute these findings, and the findings constitute good
> cause for discounting Dr. Thomas' opinions.  *See Lewis v. Callahan*, 125 F.3d
> 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th
> Cir. 1991).  Likewise, regarding the third issue, as the Magistrate Judge correctly
> noted, the burden remained with Plaintiff to present evidence that he had sought
> out low-cost medical treatment but was denied treatment due to lack of finances.
> *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Riggins v. Apfel*, 177
> F.3d 689, 693 (8th Cir. 1999).  As Plaintiff failed to meet this burden, no error has
> been shown regarding the ALJ's consideration of Plaintiff's alleged inability to
> afford medical care and treatment.

Doc. 22 at 2.  After consideration of the record, it is recommended that the decision of

the Commissioner be reversed and the case remanded to the Commissioner for further

proceedings.

## I.  Procedural History

The procedural history of this case is set forth in the Report and

Recommendation and incorporated herein by reference.  Doc. 20 at 1- 2.  Briefly,

Plaintiff filed applications for a period of disability and Disability Insurance Benefits (DIB)

and Supplemental Security Income (SSI).  R. 12, 76, 192.  (Citations to the record shall

be by the symbol "R." followed by a page number that appears in the lower right corner.)

In both applications, Plaintiff alleged disability beginning October 20, 2009. *Id.*

Plaintiff's date last insured for DIB was December 31, 2014. *Id.* On August 28, 2012,

the ALJ entered a decision and denied Plaintiff's applications for benefits concluding

that Plaintiff was not disabled from October 20, 2009, through the date of the ALJ's

decision. R. 25. On November 29, 2013, the Appeals Council denied the request for

review making the ALJ's decision the final decision of the Commissioner. R. 1-6; *see*

20 C.F.R. § 404.981.

On December 20, 2013, Plaintiff filed a Complaint with the United States District

Court seeking review of the ALJ's decision. Doc. 1. The parties filed memoranda of

law, docs. 16 and 19. On August 13, 2014, a Report and Recommendation was

entered recommending that the ALJ's decision be affirmed. Doc. 20. Plaintiff filed

Objections on August 27, 2014. Doc. 21. On February 20, 2015, Senior District Judge

Paul recommitted the case to the undersigned for further consideration. Doc. 22.

## II. Legal Standard of Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles. 42

U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial

evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of record, resolving conflicts that might appear.  20 C.F.R. § 404.1527.[2]  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion -- "[t]he more a medical source presents relevant evidence to support an

---

[1]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[2]  The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

opinion, particularly medical signs and laboratory findings, the more weight" that opinion

is given; (3) the opinion's consistency with the record as a whole; (4) whether the

opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other

relevant but unspecified factors.  20 C.F.R. § 404.1527(b) and (c).

A consultative examination that is a one-time examination by a physician who is

not a treating physician, need not be given special deference by the Commissioner.

McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705,

709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight").  The

opinion of a consultative physician, however, is still a medical opinion deserving of

consideration along with all of the other evidence.  An ALJ can assign great weight to

State agency physician opinions where the expert opinions are supported by and

consistent with the record as a whole.  Ogranaja v. Comm'r of Soc. Sec., 186 F. App'x

848, 850-51 (11th Cir. 2006) (unpublished); 20 C.F.R. § 404.1527(e)(2)(i) (explaining

that State agency medical and psychological consultants are highly qualified physicians,

psychologists, and other medical specialists who are also experts in Social Security

disability evaluations).  Stated otherwise, if the opinion of a consulting examining

physician is consistent with other medical evidence, it is entitled to great weight.

Moncrief v. Astrue, 300 F. App'x 879, 881 (11th Cir. 2008) (unpublished).

"The opinions of nonexamining, reviewing physicians . . ., when contrary to those

of the examining physicians, are entitled to little weight, and standing alone do not

constitute substantial evidence."  Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir.

1987); see Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990) (explaining that

opinion of non-examining physician is "entitled to little weight and taken alone does not

constitute substantial evidence to support an administrative decision") (citing Broughton

v. Heckler, 776 F.2d 960, 962 (11th Cir.1985)).  Nonetheless, although the ALJ is not

bound by nonexamining state agency sources, assessments by non-examining

physicians may be considered by the ALJ as expert opinions.  20 C.F.R.

§ 404.1527(e)(2)(i).

     In its recommittal Order, the Court noted an important standard:

> "Procedurally, an ALJ is 'required to state with particularity the weight he [gives] the different medical opinions and the reasons therefor.'" *Shaw v. Astrue*, 392 F. App'x 684, 686 (11th Cir. 2010) (quoting *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).  "[B]ecause an ALJ is not permitted to substitute his judgment for that of the medical experts, the ALJ cannot reject portions of a medical opinion without providing an explanation for such a decision."  *Klien-Parris v. Astrue*, No. 1:10-cv-111-MP-GRJ, 2011 WL 4375047, at *11 (N.D. Fla. Aug. 18, 2011) (citing *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986); *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *Morrison v. Barnhart*, 278 F. Supp. 2d 1331, 1337 (M.D. Fla. 2003)).  Absent such an explanation, "'it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'" *Murphy v. Comm'r of Soc. Sec.*, No. 6:12-cv-451-Orl-31TBS, 2013 WL 4494122, at *7 (M.D. Fla. Aug. 19, 2013) (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).  Accordingly, an ALJ's failure to state with particularity the weight given to different medical opinions and the reasons therefor "is reversible error." *Davis v. Barnhart*, 186 F. App'x 965, 967 (11th Cir. 2006).

Doc. 22 at 4.[3]

---

[3]  The Court then noted:

     In this case, assuming, *arguendo*, that the ALJ's RFC determination was at odds with the opinion of Dr. Chodosh, then the ALJ was required to both state with particularity the weight he accorded Dr. Chodosh's opinion and explain his reasons for rejecting Dr. Chodosh's opinion regarding the frequency of Plaintiff's ability to lift/carry. However, having reviewed the ALJ's written decision, it is unclear where, if anywhere, the ALJ satisfied this requirement.  The ALJ made explicit statements regarding the weight accorded to the opinions of other providers, giving, for example, "great weight" to the opinions of Plaintiff's treating pain specialist and neurosurgeon, "little weight" to the opinion of Plaintiff's primary care physician, and "some weight" to the opinions of the non-examining physicians employed by the State Disability Determination Services.  R. 21, 23. However, despite detailing the findings and opinions of Dr. Chodosh, the ALJ

>       Additionally, the Court notes that although an ALJ is required to explain with
>       particularity the weight accorded to the different opinions of medical doctors,
>       including those of consulting physicians, "in limited circumstances, the failure of
>       an ALJ to state the weight given to the medical opinion of a physician may be
>       harmless error." *Ostos v. Astrue*, No. 11-23559-CIV, 2012 WL 6182886, at *13
>       (S.D. Fla. Nov. 20, 2012) (citing *Caldwell v. Barnhart*, 261 F. App'x 188, 191
>       (11th Cir. 2008)); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535–36
>       (6th Cir. 2001); *Miner v. Astrue*, No. 3:11-cv-50-J-TEM, 2012 WL 955221, at *5
>       (M.D. Fla. March 21, 2012).

Doc. 22 at 7.  Thus, if it is determined that the ALJ "failed to explain with particularity the

weight accorded to Dr. Chodosh's opinion and the reasons therefor," it must be

determined whether the error harmless.  *Id.*

## III.  Relevant Evidence

A detailed statement of the medical and other evidence is set forth in the Report

and Recommendation.  Doc. 20 at 9-23.  The relevant evidence related to the lift and

carry issue is recited below.

On July 27, 2009, Plaintiff had a MRI of the cervical spine.  R. 326.  The MRI

showed a spondylitic bulge at C5–6 and a protrusion paracentral to the left that was

impinging upon the left C6 nerve root, almost touching but not deforming the ventral

cord.  *Id.*

On August 17, 2009, Plaintiff underwent a workers' compensation examination

performed by Dr. Wagdi Faris, M.D.  R. 289.  Plaintiff's symptoms included neck pain,

numbness along the right thumb, index, and middle fingers on the volar aspect which

could be related to carpal tunnel.  He also complained of burning and numbness along

both feet and ankles.  Dr. Faris reported that Plaintiff's back was not tender, that the

---

made no comparable statement with regard to the weight accorded to Dr.
Chodosh's opinions.  R. 20.  Further, it is unclear how, if at all, the ALJ explained
his reasons for seemingly rejecting Dr. Chodosh's opinion that Plaintiff could only
lift and carry occasionally.  Doc. 22 at 4-5.

straight leg-raising was negative, that his motor power was intact, and that his sensation was adequate.  He had good peripheral pulse on the lower extremities.  A cervical spine MRI revealed a protruding disc at C5-6.  Plaintiff was also diagnosed with probable carpal tunnel syndrome of the right hand and numbness on both feet and ankles, which could be related to diabetes.  Plaintiff continued to work.  *Id.*

Plaintiff continued to experience significant neck pain and on October 20, 2009, Steven A. Reid. M.D., a neurosurgeon, provided a neurological consultation and examined Plaintiff.  R. 367-69 (Exhibit 5F), 676-78 (Exhibit 22F); *see* R. 18.  Dr. Reid reported that Plaintiff's chief complaint was neck pain radiating into his shoulders and arms, worse on the left side, and a secondary complaint of low back pain.  R. 367.  His symptoms did not respond to physical therapy and medications.  He reported experiencing excruciating pain while driving because of the bouncy ride in his vehicle.  He reported he saw Dr. Faris who recommended surgical treatment.  *Id.*  He also reported numbness and tingling affecting both arms, hands, legs, and feet.  He reported he had no episodes of neck pain prior to his May 2009 accident.  He reported intolerance to codeine and aspirin, but he currently took Lisinopril, Metroprolol, and Metformin.  *Id.*  Examination revealed, in part, that he was morbidly obese and had mild bilateral venous stasis changes in his distal legs and feet.  R. 368.  Neck exam revealed a full ROM.  *Id.*  Neurologic exam was normal.  Cervical foraminal closure maneuvers elicited left cervicobrachial brachial pain and motor examination revealed weakness of the left grip and biceps.  His gait and station appeared normal.  Straight leg-raising did not elicit sciatica.  He was advised to undergo surgery at C5-6.  R. 368-69.

On December 14, 2009, Wilda Murphy, M.D., completed an evaluation for workers' compensation and examined Plaintiff.  R. 554-59; *see* R. 18.  Plaintiff reported having neck and back pain and was referred for surgery.  He described pain in the front part of his knees with some tenderness.  He had increased pain with walking activities, left greater than right, and had pain in the medial aspect of the knees.  Plaintiff had numbness of his feet, ankles, hands and arms.  Examination revealed he was morbidly obese with a BMI of 41 and had mild difficulty raising from a chair.  His gait was non-antalgic.  R. 556.  He lacked five to ten degrees of extension to the left knee secondary to tightness of hamstrings and there was crepitus with ROM of the knees, primarily on the left.  *Id*.  He was diagnosed with bilateral knee pain and morbid obesity.  Plaintiff suffered from underlying arthritis exacerbated by contusion to his knees after the automobile accident.  R. 557.  *He was currently out of work and restrictions consisted of no heavy carrying (40 pounds), avoiding kneeling and squatting due to his knees only. Id. see* R. 18.

On January 11, 2010, Plaintiff underwent bilateral x-rays of his knees.  R. 551.  X-rays showed tricompartmental chondromalacia with mild to moderate osteoarthritic changes seen involving the left patellofemoral and lateral compartments and mild osteoarthritic changes involving the patellofemoral and medial compartments.  *Id.*

From January 2010 through April 2010, Dr. Reid treated Plaintiff for intractable cervicobrachial pain.  R. 373-87.  On January 13, 2010, Plaintiff underwent a C5-6 anterior microsurgical discectomy, osteophytectomy, and allograft arthrodesis. R. 382-86, 681-85; *see* R. 18.  His post-operative diagnosis was C5-6 herniated nucleus pulposus with radiculopathy.  R. 383, 681.  Progress notes dated February 25, 2010,

indicate that Plaintiff continued to complain of low back pain and occasional cramps and pain radiating into his lower extremities.  He also reported relief with his radiating upper extremity pain and his hand pain, numbness, and tingling.  Dr. Reid indicated that Plaintiff had mild lumbar myospasm.  R. 376, 674.  *Dr. Reid stated Plaintiff could return to work on light duty status, but needed to keep his collar on at all times and refrain from lifting anything over 20 pounds.*  Physical therapy was prescribed.  R. 376-77, 674-75; *see* R. 18.  On March 29, 2010, Dr. Reid reported that Plaintiff had resolution of his upper extremity symptoms after undergoing neck surgery in January 2010.  Plaintiff reported occasional low back pain and occasional tingling in his legs.  An examination revealed intact strength and sensation throughout.  R. 375, 673.

On April 13, 2010, Dr. Reid examined Plaintiff and noted Plaintiff's report of good relief of his neck and upper extremity symptoms.  Plaintiff complained of low back pain and upon examination Dr. Reid determined that Plaintiff had mild lumbar myospasm and in a straight leg raising elicited bilateral hip pain at 60 degrees.  Plaintiff remained off work at this time.  A lumbar spine MRI was ordered.  R. 373-74, 671-72.

On April 28, 2010, Dr. Reid examined Plaintiff and reported that he had no complaints pertaining to his neck or upper extremities.  Plaintiff continued to experience low back pain with pain radiating to his hips.  He had no complaints referable to his neck or upper extremities.  Dr. Reid noted that Plaintiff's gait and station appeared normal and that Plaintiff's MRI of the lumbar spine showed no neural compressive pathology. R. 669-70.  *He released Plaintiff to return to work in full capacity with the exception of avoiding overhead work* and he referred him to a physiatrist for management of his low back pain.  R. 670; *see* R. 18.

From February 2010 through September 2010, Dr. Murphy treated Plaintiff. R. 531-53.  On February 9, 2010, Plaintiff presented with bilateral knee pain.  R. 552-53. Examination revealed he was overweight and his pressure was elevated.  He was wearing a cervical collar and had crepitus with ROM of both knees, left greater than right, and with left knee extension, he had five to ten degrees due to tight hamstrings. He was diagnosed with bilateral knee pain with tri-compartmental chondromalacia with mild to moderate osteoarthritic changes, left greater than the right.  *Id.*  On March 23, 2010, Plaintiff presented with knee pain associated with underlying arthritis.  R. 547-48; *see* R. 19.  He started physical therapy which was helpful, but he was still having difficulty negotiating stairs due to knee pain.  Examination revealed a slow gait mild tenderness to the popliteal fossa on the left and not on the right; medial joint line tenderness on the right; and lateral joint line tenderness on the left.  *Id.*  On May 18, 2010, examination revealed continued knee pain.  R. 543-44.  Plaintiff had completed 16 visits with physical therapy and had been discharged as he achieved functional ROM and strength.  R. 534.  Plaintiff had lost 82 pounds since the accident and acknowleged it had a positive impact regarding his knee pain.  His strength improved grossly to 5/5. *Id.*  Examination revealed a slight limitation in the extension bilaterally and mild joint line tenderness with no effusion, and mild crepitus on ROM with significant crepitus on the right.  He underwent steroid injections to both knees.  R. 544.  Dr. Murphy noted that Plaintiff "has done well after conservative treatment with PT and weight loss.  He has no restrictions to his knees."  *Id.*; *see* R. 19.

On July 23, 2010, Plaintiff reported to Dr. Murphy that he had pain in the base of his neck referring to the upper thoracic region and axial low back pain.  R. 537-42; *see*

R. 19.  His symptoms were continuous, severe, dull, sharp, pressure-like and throbbing. The range of motion of his neck, sitting, standing, driving, twisting, bending, and laying down and lifting worsened his pain.  Moving around made the pain better.  Examination revealed his gait was slow but non-antalgic and he had increased muscle tone primarily to the left upper trapezius muscle.  He was guarded with ROM of the cervical spine in all planes with ROM at least 50 percent of normal range.  Flexion of the lower spine was at 60 degrees with limited extension of five degrees.  Otherwise, he had full ROM x4 extension.  He had diminished pinprick to his arms and forearms bilaterally except for his hands.  His motor strength was good x4 extension.  R. 539.

On July 23, 2010, Dr. Murphy completed a functional limitations and restrictions form regarding Plaintiff's condition.  R. 542.  Plaintiff was diagnosed with neck and back pain, underwent physical therapy, and was to avoid repetitive overhead activities. *Dr. Murphy added a new restriction for Plaintiff's low back to avoid heavy lifting above 50 pounds.*  R. 540, 542; *see* R. 19.  MMI was anticipated in two months and it was not determined whether a residual clinical dysfunction or residual functional loss was anticipated for the work-related injury.  R. 542.

On October 1, 2010, Plaintiff reported to Dr. Murphy having continuing difficulty with neck pain.  R. 525-27, 560-62.  He was still attending physical therapy and was having difficulty with strengthening exercises to the upper extremities.  R. 526; *see* R. 19.  He denied disability; he received "work comp check."  R. 525, 560.  He also still had ongoing low back pain with burning sensation that would occasionally go down his legs, but primarily occurred with standing and walking.  Examination revealed decreased ROM of the cervical spine with lateral rotation to 30 degrees.  Plaintiff was

unable to touch his chin to his chest and cervical motion was limited.  He had mild tightness to the right upper trapezium and slightly limited ROM of his shoulders, right more than left.  He also had diffuse tenderness of his lumbar spine.  Dr. Murphy had a six percent permanent impairment rating of the cervical spine for surgically treated disc lesion.  Since he had his C5-6 single level fusion, his impairment had increased by one percent for a total of seven percent and for lumbar pain associated to chronic muscle spasms, he was assigned a three percent permanent impairment rating.  *Id.  His permanent restrictions were to avoid repetitive overhead activities and no lifting above 50 pounds.*  R. 527; *see* R. 20.

On February 9, 2011, at the request of the state disability agency, Plaintiff was examined by Diana M. Benton, Psy.D., a psychologist.  R. 618-22.  Plaintiff reported arthritis in both knees, a back injury, neck injury, shoulder, back, hip, leg, and foot pain. R. 618.  *Plaintiff explained that he had a limited ability to turn his head in all directions, was limited in lifting and overhead work*, and suffered from depression.  *Id.*  Plaintiff described difficulty buttoning buttons but was able to do limited cleaning.  R. 619-20. Dr. Benton diagnosed Plaintiff with generalized anxiety disorder.  *Id.*  Dr. Benton recommended that a qualified physician be enlisted to comment on Plaintiff's physical limitations and the impact that these may have on the prognosis for his ability to perform different types of work.  "Regarding his ability to perform various work related mental activities, he appears to have adequate capacity in the areas of understanding and memory, concentration, persistence, social interaction and adaptation to perform work for which he is suited.  Should anxiety symptoms persist, he may benefit from psychopharmacological evaluation."  R. 621.

On February 16, 2011, Bruce E. Thomas, M.D., Plaintiff's primary care physician, completed a Medical Examination Report for Commercial Driver Fitness Determination recertification.  R. 690-92.  Plaintiff certified, in part, that he did not have chronic low back pain, that he had no spinal injury, indicated "no" for diabetes, and that this information was complete and true.  Dr. Thomas's name and affiliation are provided with the following: "(no limitations)."  R. 690.  (Plaintiff indicated he had high blood pressure and was taking medication.  Dr. Thomas stated his "blood pressure is well controlled with meds." *Id.*)  Dr. Thomas reported (by check marks) that Plaintiff did not have any extremities, spine, or other musculoskeletal abnormalities and no previous surgery, deformities, limitation of motion, or tenderness.  He also indicated (by a check mark) that Plaintiff met the regulatory standards and qualified for a two-year certificate. R. 692; *see* R. 20.[4]

On June 22, 2011, at the request of the state disability agency, Lance I. Chodosh, M.D.,  examined Plaintiff as part of a disability determination.  R. 647-54; *see* R. 20.  Plaintiff provided a history of his present problems.  R. 647.  He reported arthritis in his knees, and a neck and back injury with pain in his neck, shoulders, thighs, hips, legs, feet and reported depression.  Examination revealed Plaintiff was obese and slightly unhealthy appearing.  R. 648.  There was one plus pitting edema in the lower legs and ankles.  Straight leg-raising was limited to 80 degrees bilaterally while in the

---

[4]   The conclusions reached in this report are far different from Dr. Thomas's June 25, 2012, functional capacity evaluation.  R. 702.  The ALJ considered Dr. Thomas' February 16, 2011, report, R. 20, and his June 25, 2012, evaluation, R. 21.  Although noting that he was Plaintiff's primary care physician, the ALJ gave Dr. Thomas's opinion "little weight" in light of Plaintiff's "sporadic and essentially conservative" treatment history with Trenton Medical Center/Palms Medical Group.  R. 21-22.  The ALJ also noted that Plaintiff "has reported activities of daily living which are in excess of Dr. Thomas's limitations (Exhibits 4E, 6E, and 18F; hearing testimony)."  R. 22.

supine position and limited by tight hamstrings and negative to 90 degrees bilaterally while sitting; and pin sensation was decreased on the medial aspects of both ankles. R. 649.  He had decreased ROM of the cervical spine with lateral flexion, extension, and rotation.  Dr. Chodosh reported that Plaintiff's shoulder, knee, ankle, elbow, wrist, hand, ankle, hip, and lumbar spine ranges of motion were normal.  R. 651-52.  He declined to squat and rise as he was advised not to.  R. 647-649.  Addressing Plaintiff's functional status, Dr. Chodosh indicated that Plaintiff could perform activities of daily living without assistance, could walk a mile at a time relatively well; and stand comfortably for 30 minutes without resting; could sit in one position for 20 minutes; he could bend over at the waist in limited fashion; *he could lift 50 pounds but could not lift objects overhead; had some difficulty grasping objects; and had some difficulty with very fine motor activity with his right hand*.  R. 647.  Dr. Chodosh also indicated that Plaintiff's motor function was grossly normal in all four extremities with 5/5 strength throughout and that his gait and standing balance were normal.  R. 649.  Plaintiff was diagnosed with obesity, chronic neck and back pain of uncertain etiology, without physical signs of significant impairment; prominent breathing pattern probably reflecting obesity, some smoking-related damage, and probable upper airway obstruction; probable obstructive sleep apnea; and knee pain.  R. 650.  Based only on objective evidence, Plaintiff was able to stand, walk, sit, and bend at the waist.  He can probably squat occasionally and can kneel; *"[h]e can lift and carry occasionally, limited by probable lack of stamina"*; he can handle objects and he can hear and speak normally.  *Id.*; *see* R. 20.

On July 5, 2011, state agency medical consultant, Shakra Junejo, M.D., reviewed Dr. Chodosh's June 22, 2011, medical report, and other medical evidence indicating

that Plaintiff's lumbar spine MRI revealed no impingement and that he was released for

light duty on February 25, 2010.  R. 663; *see* R. 23.  Dr. Junejo noted that Dr. Chodosh

reported that Plaintiff could walk a mile, *lift 50 pounds, but not overhead*, that he was

independent with his activities of daily living, and that his gait and balance were normal.

Dr. Junejo also reported that Plaintiff's October 2010 lumbar spine MRI indicated no

impingement.  *Id.*  Dr. Junejo did not expressly refer to Dr. Chodosh's lift and carry

opinion.  R. 663.  Dr. Junejo completed a Physical Residual Functional Capacity

Assessment and opined that Plaintiff *could lift and/or carry up to 20 pounds occasionally

and ten pounds frequently*; could sit and stand and/or walk about six hours in an eight-

hour workday; and could occasionally climb ramps and stairs, balance, stoop, kneel,

crouch, and crawl, but never climb ladders, ropes, or scaffolds.  R. 657-58.

Regarding Plaintiff's ability to lift and carry, the ALJ referred to Dr. Junejo's

report, who in turn referred to Dr. Chodosh's medical findings that Plaintiff could lift 50

pounds, R.647, and concluded that Plaintiff could perform a restricted range of light

work.  R. 23, 663.  Dr. Junejo reviewed more than Dr. Chodosh's report and provided

"additional comments."  R. 663.

IV. ADDITIONAL COMMENTS:

Alleges injury to neck, back, b/knnes [sic], arthritis b/knees, pain in joints, wt
275lbs; Recon: increased pain.

6/22/11 CE [R. 647-54]: MVA 5/2009 [R. 332-33].  1/2010 ACDF C5-6 [R. 373-
87, 551]. 10/1/10 MMI [R. 525-27]  Avoid repetitive overhead activities, lifting
heavy wts.  After improvement w surgery, pain has returned.  Knee pain
refractory to inj.  Functions: walk a mile, lifts 50lbs but not overhead.  Ties shoes.
ADL independent.  wt 292lbs, BP 128/70.  vv+, calluses on hands. slr-. Gait,
balance-nl.  ROM cervical spine decreased, nl rom LS, bl knees.
Rehab med 10/1/10: Cervicalgia w single level fusion, lspine w MRI -no
impingement, chr ls spasm.-at MMI.
0% IMPAIRMENT FOR KNEES.

>       4/13/10 SE NEUROSURGERY [R. 373-74]: SX RELIEF NOTED.  XRAY CV SP:
>       BONE GRAFT IN GOOD POSITION.
>       2/25/10 RELEASED FOR LIGHT DUTY WORK [R. 376-77].

R. 663.  Dr. Junejo reduced his assessment of Plaintiff's RFC "to reflect limitations."

R. 661.  Some of Dr. Junejo's more noteworthy references are to patient notes of

Drs. Reid and Murphy.  *Compare* R. 663 (Exhibit 20F) *with* R. 373-74 (Exhibit 5F-

Dr. Reid), 376-77 (Exhibit 5F-Dr. Reid), 525-27 (Exhibit 10F-Dr. Murphy).

     On June 25, 2012, Dr. Thomas saw Plaintiff and completed a Functional

Capacity Evaluation.  R. 702; *see* R. 21.  *The lifting/carrying part of the form is difficult*

*to read because it appears Dr. Thomas placed a check mark in two boxes (can lift*

*and/or carry twenty pounds occasionally and ten pounds frequently; can lift and/or carry*

*ten pounds occasionally and five pounds frequently) and also circled the box indicating*

*that Plaintiff can lift and/or carry ten pounds occasionally and five pounds frequently.  Id.*

Plaintiff did not submit any clarification from Dr. Thomas.  To the right of these boxes is

the following explanation: "causes pain in lower back and shoulders."  *Id.*

     Dr. Thomas also indicated that during an eight-hour workday, Plaintiff could only

sit for four hours and stand or walk for one hour total and must periodically alternate

between sitting and standing every 15 to 20 minutes.  *Id.*; *see* R. 21.  It would be

expected that Plaintiff would be absent from work more than four days per month and

that during a typical workday, Plaintiff's pain or other symptoms would frequently

become severe enough to interfere with his attention and concentration need to perform

even simple work tasks.  Plaintiff would also require periods of time when he must lay

down or elevate his legs to alleviate pain.  Plaintiff should never work with or around

hazardous machinery and rarely bend or stoop.  He could occasionally reach, climb and

balance, operate motor vehicles, push and pull the arm and/or leg controls, and engage

in gross and fine manipulation.  *Id.*  Dr. Thomas concluded his evaluation by noting that

the medical basis for these restrictions included neck pain, status post cervical spine

surgery, and arthritis of the lower spine and knees and that these restrictions applied as

of June 2011.  *Id.*

## IV.  Legal Analysis

> For Plaintiff, the critical issue

> is not whether [Plaintiff] could lift 10, 20, or even more pounds during the
> workday – the issue is the FREQUENCY within which [Plaintiff] was able to lift.
> Dr. Chodosh examined [Plaintiff] for the express purpose of assessing his
> functioning by the state disability agency.  The issue surrounds the definition
> under the Commissioner's own regulations, defining "light work" as involving
> lifting no more than 20 pounds at a time with *frequent* lifting or carrying of objects
> weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).

Doc. 25 at 2.  "The issue is not the weight.  The issue is the frequency.  A limit to only

occasional lifting means that the claimant cannot perform the regulatory definition of

light work. . . .An *occasional lifting/carrying limitation* is a significant deviation from light

work – because light work, by definition, means frequent lifting 10 pounds."  *Id.* at 3.

Further, Plaintiff argues that the error was not harmless, in part, because the vocational

expert was not asked to determine if any of the light work, unskilled occupations listed,

such as marker, bar attendant, page/runner, shelving clerk, or stack clerk, *see* R. 24,

*see also* 61, "could be performed with only occasional lifting."  Doc. 25 at 3.[5]

---

[5]  Toward the early part of the hearing before the ALJ, the ALJ asked Plaintiff to
describe his past work and his accident (May 18, 2009).  R. 37-39.  The ALJ asked the
vocational expert if she had any questions for the Plaintiff regarding his past work and
she replied: "Just if you're interested in what he lifted" and the response was
"[INAUDIBLE]."  R. 39.  Plaintiff testified he could lift a gallon of milk out of the
refrigerator "to the counter."  R. 49.  Plaintiff had been taking groceries out of the truck
and into the house, but he was tired and it hurt his shoulders and his back.  *Id.*; *see*

The Commissioner argues that the ALJ considered Dr. Chodosh's report and opinion regarding Plaintiff's ability to lift 50 pounds and that he "can lift and carry occasionally," in conjunction with the other medical evidence of record, including the patient notes and opinions of Drs. Reid and Murphy, and State agency medical consultant, Dr. Junejo, when he formulated Plaintiff's residual functional capacity (RFC).[6]  Doc. 24 at 1-4.  The Commissioner acknowledges that the ALJ "did not articulate the weight he accorded Dr. Chodosh's opinion," but argues that the medical evidence considered by the ALJ was "consistent with the ALJ's [RFC] assessment that

---

R. 17.  The vocational expert was asked a hypothetical question by the ALJ, which included the fact that the hypothetical person (Plaintiff) "would be limited to occasional overhead reach."  R. 60-61.  The vocational expert opined that Plaintiff's past work as a truck driver (fuel delivery) and tractor-trailer truck driver would be eliminated.  *Id.*  Plaintiff's counsel asked the vocational expert several hypothetical questions, but did not ask the vocational expert to assume whether Plaintiff could perform the jobs such as marker, with the ability to only lift or carry objects occasionally.  R. 62-65.  Also, no weight limitations were presented to the vocational expert by the ALJ or counsel.  R. 60-65.  Some medical records were discussed during the hearing, such as Dr. Murphy's October 1, 2010, permanent restriction to avoid overhead activities and no lifting above 50 pounds, R. 42, 44-45, 527, 562; Dr. Reid's April 28, 2010, note that Plaintiff was to return to full capacity with the exception of avoiding overhead work, R. 43, 670; and Dr. Reid's February 25, 2010, note stating that Plaintiff should refrain from lifting over 20 pounds and returned to work (on a light duty status), R. 45-46, 377, 675.  Dr. Chodosh's report and opinions are not mentioned during the hearing.  R. 32-67.  In her pre-hearing brief to the ALJ, Plaintiff's counsel provided a brief summary of Dr. Chodosh's examination report, R. 102, and mentioned, in passing, his lift/carry limitation, without legal argument.  R. 105.  In a post-ALJ decision brief to the Appeals Council, Plaintiff's counsel provided a brief summary of Dr. Chodosh's report, R. 280, but omitted any argument regarding Plaintiff's lift/carry limitation.  R. 279-88; *see* R. 2, 4 (Appeals Council consideration of counsel's post-hearing brief).  It appears the issue considered by the Court herein was first raised in Plaintiff's initial memorandum filed in this Court. Doc. 16 at 10-14.

  [6]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c).

Plaintiff could perform the requirements of light work." *Id.* at 4.  For the Commissioner, any error was harmless.  *Id.* at 4-5.

Regarding Plaintiff's ability to lift and carry and Plaintiff's overall RFC, the ALJ discussed the relevant medical opinions in the record and found that Plaintiff's limitations did not preclude him from performing light work with restrictions.  In making this determination, the ALJ also considered Plaintiff's hearing testimony and pre-hearing statements.  R. 17, 22-23.

The ALJ discussed the results of Dr. Chodosh's consultative physical examination of Plaintiff, which is generally consistent with the patient notes of treating physicians, save Dr. Thomas.[7]  R. 20.  For example, on May 27, 2009, Dr. Rhiddlehoover reported that Plaintiff had a normal motor and sensory examination of the upper and lower extremities, that he had a full ROM in the lumbar spine, a negative straight leg-raising, and that he could return to full-duty work status.  R. 333. On August 17, 2009, Plaintiff underwent a workers' compensation examination performed by Dr. Faris.  R. 289.  Dr. Faris reported that Plaintiff's back was not tender, that the straight leg-raising was negative, that his motor power was intact, and that his sensation was adequate.  *Id.*  On October 20, 2009, Plaintiff was examined by Dr. Reid. R. 367-69, 676-78.  By February 25, 2010, Plaintiff returned to Dr. Reid's office following his January 13, 2010, cervical surgery.  R. 376-77, 674-75.  Dr. Reid noted:

---

[7]  Dr. Chodosh reported, in part, that Plaintiff's motor function was grossly normal in all four extremities with 5/5 strength throughout and that he could lift 50 pounds but could not lift objects overhead.  R. 647, 649.  State agency medical consultant, Dr. Junejo specifically noted that Dr. Chodosh found that Plaintiff could lift 50 pounds but did not mention Dr. Chodosh's opinion regarding Plaintiff's ability to lift and carry occasionally.  R. 663.  Based on his review of medical evidence of record, *see supra* at 17, Dr. Junejo determined that Plaintiff could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently.  R. 657-58, 662-63.

"Examination today revealed unremarkable vital signs as documented on our progress note.  The surgical scar appeared well healed and non-tender.  He had intact strength and sensation.  He had mild lumbar myospasm.  I concluded his progress appears generally satisfactory.  I prescribed physical therapy.  I released him for light duty work. I scheduled followup in one month."  R. 376, 674.  On the same date and in a separate note, *Dr. Reid also noted that Plaintiff could return to work on a light duty status although he must keep his collar on at all times and refrain from lifting anything over 20 pounds.*  R. 377, 675.  On April 28, 2010, Dr. Reid noted that Plaintiff had made a good recovery from the cervical spine surgery and further noted that he "released him to return to work in full capacity with the exception of avoiding overhead work."  R. 670.

The ALJ considered the April 28, 2010, opinion of Dr. Reid, R. 669-70 (Exhibit 22F at 1 and 2), Plaintiff's treating neurosurgeon, and gave "it great weight."  R. 21. The ALJ stated:

> The undersigned notes that Dr. Reid has a treatment history with the claimant and his opinion is supported by objective medical findings, including no obvious cranial nerve, higher cortical function, memory, language, or cerebellar abnormalities; normal fund of knowledge; well-healed and non-tender surgical scar; normal gait and station; no neural compressive pathology of the lumbar spine per MRI; and good recovery from cervical spine surgery (Exhibit 22F/1). Furthermore, Dr. Reid is a Board Certified Neurological Surgeon.  As stated above, the undersigned notes that, at the hearing, the claimant testified to only taking over the counter medications for pain.

R. 21.

Dr. Murphy evaluated Plaintiff beginning on December 14, 2009.  R. 554-59. Plaintiff was subsequently examined and treated by Dr. Murphy (Plaintiff's treating pain specialist) on several occasions.  For example, on July 23, 2010, Dr. Murphy completed a functional limitations and restrictions form regarding Plaintiff's condition.  R. 541-42.

*Plaintiff was diagnosed with neck and back pain, underwent physical therapy, and was*

*to avoid repetitive overhead activities and he was limited to no lifting above 50 pounds.*

R. 542.  On October 1, 2010, Plaintiff reported to Dr. Murphy having continuing difficulty

with neck pain.  R. 525-27.  Plaintiff received several impairment ratings and his

permanent restrictions were to avoid repetitive overhead activities and *no lifting above*

*50 pounds*, R. 527, assessments noted by the ALJ, R. 20.  The ALJ, referring to

Dr. Murphy's October 1, 2010, assessment, *see* R. 562 (Exhibit 11F at 3), gave

Dr. Murphy's opinion "great weight."

> The undersigned notes that Dr. Murphy has a treatment history with the claimant and his opinion is supported by objective medical findings, including slow, but less antalgic gait; decreased cervical lateral rotation and extension; mild tightness to right upper trapezium, but without discrete trigger points; slight limited range of motion of shoulders; slight increase in lumbar lordosis with diffuse tenderness throughout lumbar paraspinals; decreased lumbar flexion and extension; and negative straight leg raises.  The claimant was doing better and only taking pain medications as needed, rather than daily.  He was given a combined permanent impairment rating only 8% for the cervical and lumbar spine (Exhibit 11F/2-3).  Furthermore, the claimant reported only taking Percocet on an as needed basis and could go days without it; took OTC Aleve.  He stated that his pain was worse towards the end of the day, but he was able to stay active throughout the day (Exhibit 11F/1).  Furthermore, Dr. Murphy is Board Certified in Physical Medicine and Rehabilitation.  The undersigned also notes that, at the hearing, the claimant testified to only taking over the counter medications for pain.

R. 21.

The ALJ considered the opinion of Dr. Thomas and gave "it little weight," and

provided a detailed explanation.  R. 21-22.  The ALJ considered medical records from

Trenton Medical Center/Palms Medical Group (where Dr. Thomas saw Plaintiff)

covering the period May 2009 through January 2012 and further noted that the

treatment was sporadic and conservative.  R. 20-23.  Plaintiff also does not dispute the

ALJ's finding that Dr. Thomas's extreme limitations were inconsistent with his own

assessment that Plaintiff met the standards and qualified for a two-year commercial

driver's license with the medical evidence from the Trenton Medical Center/Palms

Medical Group that did not document treatment for complaints of back, knee, or neck

pain, and with Plaintiff's own reported activities of daily living. R. 22, 692.  The Court

has previously rejected Plaintiff's argument to the contrary.  Doc. 22 at 2.

After discussing the relevant evidence, the ALJ stated that his RFC assessment

was supported by record evidence and the ALJ summarized the evidence.  R. 22-23.

> In sum, the above residual functional capacity assessment is supported by the
> following.  First, the claimant has described daily activities, which are not totally
> limited and that are consistent with the residual functional capacity found in this
> decision.  The undersigned notes that, at the hearing, the claimant testified that
> his wife did all the household activities; however, the undersigned does not find
> this entirely credible as his wife is disabled.  Furthermore, at one point or another
> in the record (either in forms completed in connection with the application and
> appeal, in medical reports or records, or in the claimant's testimony), the claimant
> has reported the following daily activities: applying for jobs, taking care of
> personal needs, preparing light meals, doing laundry, loading/unloading
> dishwasher, being able to walk a mile at a time and lift 50 pounds, driving (drove
> 39 miles to the hearing), shopping and carrying groceries, managing finances,
> and watching television, (Exhibits 4E, 6E, and 18F; and hearing testimony).

> Furthermore, as mentioned earlier, the record reflects work activity after the
> alleged onset date.  Although that work activity did not constitute as substantial
> gainful activity, it does indicate that the claimant's daily activities have, at least at
> times, been somewhat greater than the claimant has generally reported (Exhibits
> 3D and 5D, and hearing testimony).  The undersigned also notes that the
> claimant received unemployment compensation benefits from the 4th quarter of
> 2010 through the 1st quarter of 2012 (Exhibits 3D and 5D).  By accepting these
> benefits, the claimant acknowledges that he is ready, willing, and able to work.
> The receipt of unemployment benefits also demonstrates a certain level of
> functioning because the claimant had to make regular reports to the state and
> search for jobs in order to qualify.

> Second, the claimant has not generally received the type of medical treatment
> one would expect for a totally disabled individual and the record reflects
> significant gaps in the claimant's history of treatment.  Medical records show that
> the claimant was involved in a work-related MVA in May of 2009; however, he
> continued to work until October of 2009.  In January of 2010, he underwent a
> cervical anterior microsurgical diskectomy, which improved his symptoms.

Following surgery, he was followed both by a neurosurgeon and pain management specialist.  In April of 2010, only four months after the claimant's AOD, his neurosurgeon released him to return to work in full capacity with the exception of avoiding overhead work.  Furthermore, in October of 2010, one year after the claimant's AOD, his pain specialist released him to work with permanent restrictions to avoid repetitive overhead activities an [sic] no lifting over 50 pounds (Exhibits 1F-4F, 6F, 10F, 11F, 13F, and 22F).  Since October of 2010, the claimant's treatment has been through his primary care physician. Furthermore, that treatment has been essentially conservative in nature.  The evidence of record shows that the claimant has only seen his primary care physician on two occasions after October of 2010; once in February of 2011 for a medical examination to receive his CDL license, which he passed; and one in January of 2012 for cold complaints (Exhibits 8F, 23F, and 24F).  The evidence of record also shows that the claimant has not received any recent physical therapy or injections.  Furthermore, the record documents improvement in symptoms with physical therapy (Exhibits 10F/20 and 24, and 12F/5) and injections (Exhibit 10F/8).  The undersigned also notes that the claimant's use of medications does not suggest the presence of impairments, which are more limiting than found in this decision.  The claimant is only taking over the counter medications for pain (Exhibits 19E, and 10F/2 and 12; and hearing testimony).

In the record and at the hearing, the claimant has reported not being able to afford appropriate medical treatment and/or medication due to lack of finances and/or no insurance; however, the undersigned notes that there are State and Federal Agencies available to help individuals with both medical treatment and medications.  At the hearing, the claimant also testified to using a cane for balance; however, it was not prescribed.  The undersigned notes that there is no evidence in the record documenting the need for an assistive device. Furthermore, in June of 2012, Dr. Thomas stated that the claimant did not require the use of an assistive device for ambulation (Exhibit 25F).

Third, the description of symptoms and limitations, which the claimant has provided throughout the record, has generally been inconsistent and unpersuasive.  Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance and demeanor while testifying at the hearing.  It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.  The undersigned also notes that the record contains a statement from two treating specialists releasing the claimant to return to work (Exhibits 11F/3 and 22F/2). Furthermore, the residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also support a finding of 'not disabled.'  Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other

> reasons to reach similar conclusions.  These physicians concluded that the
> claimant could perform a restricted range of light work (Exhibits 1A and 20F).

R. 22-23.

In finding that Plaintiff retained the RFC to perform a restricted range of light work, the ALJ discussed Plaintiff's treating physicians' findings regarding his ability to lift and carry, noting that over the course of treatment, he was limited to lifting between 20 pounds to 50 pounds and no heavy carrying.  R. 18-22.  The ALJ also noted that Plaintiff was returned to work at full capacity with permanent restrictions to avoid repetitive overhead activities and that he met physical standards and qualified for a two-year commercial driver's license.  R. 18-19, 22-23.

Regarding Plaintiff's ability to lift and carry, the ALJ referred to Dr. Junejo's report, who in turn referred to Dr. Chodosh's medical findings that Plaintiff could lift 50 pounds, R. 647, and concluded that Plaintiff could perform a restricted range of light work.  R. 23, 663.  Dr. Junejo reviewed more than Dr. Chodosh's report and provided "additional comments."  R. 663; *see supra* at 17.  Dr. Junejo reduced his assessment of Plaintiff's RFC "to reflect limitations."  R. 661.

The ALJ determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with restrictions.  R. 16.  "Light work"

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying
> of objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls.  To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these activities. If
> someone can do light work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine dexterity or
> inability to sit for long periods of time.

*Id.*

The ALJ considered the medical evidence of record, which included Dr. Chodosh's report and credited the reports to the extent that Plaintiff's ability to lift and carry corresponded with a restricted range of light work.  In the "history of present problems" portion of Dr. Chodosh's report, he confirmed that Plaintiff "can lift 50 pounds, but cannot lift objects overhead."  R. 647.  In the "impressions/comments" section of his report, Dr. Chodosh states: "Based only on objective evidence this person is able to stand, walk, sit, and bend at the waist.  *He can lift and carry occasionally, limited by probable lack of stamina.*  He can handle objects.  He can see, hear, and speak normally."  R. 650 (emphasis added).  Dr. Chodosh did not place any specific weight limitation on Plaintiff's ability to lift and/or carry, although he had noted that Plaintiff "can lift 50 pounds, but cannot lift objects overhead."  R. 647, 650.

The ALJ summarized patient notes from Drs. Reid and Murphy, among other treating physicians, and gave "great weight" to their opinions.  R. 18-23.  "On February 25, 2010, Dr. Reid returned the claimant to work on a light duty status.  He had to keep his collar on at all times and refrain from lifting anything over 20 pounds."  R. 18.  During a follow-up visit on April 28, 2010, "Dr. Reid released the claimant to return to work info capacity with the exception of avoid overhead work."  *Id.*

"In July 2010, the claimant saw Dr. Murphy at the request of Dr. Reid for complaints of neck and back pain.  Dr. Murphy noted that Dr. Reid released the claimant to work info capacity on 4/28/10 except for avoiding overhead activities."  R. 19.  "The claimant was to continue restrictions as per Dr. Reid of avoiding repetitive overhead lifting with new restrictions for the low back to avoid heavy lifting above 50 pounds.  The claimant did not think he was able to return to work as a truck driver;

therefore, vocational rehabilitation was discussed." *Id.* (citations omitted).  During a follow-up visit with Dr. Murphy in October 2010, Dr. Murphy stated that Plaintiff was at MMI and assessed several permanent impairment ratings and concluded that Plaintiff "had permanent restrictions to avoid repetitive overhead activities and no lifting above 50 pounds."  R. 19-20 (citations omitted).

In June 2012, Dr. Thomas completed a Functional Capacity Evaluation and opined, in part, "that the claimant could lift/carry 10 pounds occasionally and 5 pounds frequently."  R. 21.  The ALJ considered the opinion of Dr. Thomas and gave it "little weight."  R. 21-22.  The Court has previously rejected Plaintiff's argument that the ALJ did not articulate good cause for not crediting his opinion.  Doc. 22 at 1-2.

The ALJ expressly noted that the evidence, *see, e.g.*, opinions of Drs. Reid and Murphy, indicated that Plaintiff was restricted from lifting over 50 pounds and was to avoid repetitive overhead lifting.  R. 22.  These findings, among others, support the conclusion that Plaintiff is able to lift "no more than 20 pounds at a time," and can lift and carry objects weighing up to 10 pounds, meeting two elements of being able to perform "light work."  The ALJ implicitly concluded that Plaintiff can *frequently* lift or carry objects weighing up to 10 pounds  *See* 20 C.F.R. § 404.1567(b).  This is the rub.

No treating physician expressly opined that Plaintiff can lift and/or carry weight *within any time limitations, i.e., either frequently or occasionally,* except Dr. Chodosh who opined that Plaintiff can "can lift and carry occasionally," R. 650, and Dr. Thomas who was not credited by the ALJ.  Plaintiff can occasionally lift no more than 50 pounds (and necessarily 20 pounds) and is to avoid repetitive overhead activities, but the medical evidence and other evidence relied on by the ALJ does not directly support the

ALJ's necessary conclusion that he can *frequently* lift and/or carry objects weighing up to 10 pounds.

Although Dr. Junejo opined that Plaintiff could frequently lift and/or carry 10 pounds, his opinion is based on medical evidence that does not clearly support this specific exertional limitation.  R. 657.  (His opinion that Plaintiff can lift and/or carry 20 pounds is supported by the evidence.  *Id.*)

The ALJ did not explain the weight accorded to Dr. Chodosh's opinion, and, as a result, the ALJ erred.  Unfortunately and notwithstanding the extensive medical evidence from Plaintiff's treating physicians (for example, Drs. Reid and Murphy) that Plaintiff can lift and carry at least 20 if not 50 pounds but not overhead, the Court is left to guess as to the extent of the limitation(s) Dr. Chodosh meant to impose by limiting Plaintiff to lifting and carrying occasionally, having noted that Plaintiff "can lift 50 pounds, but cannot lift objects overhead."  R. 647.  The ALJ's reliance on the patient notes and opinions of Drs. Reid and Murphy, however, to support the conclusion that Plaintiff can frequently lift and/or carry up to 10 pounds is cloudy in light of Dr. Chodosh's June 22, 2011, examination report and opinion that Plaintiff can lift and carry occasionally, which post-dates the patient notes of Drs. Reid and Murphy.  R. 650.  This is so notwithstanding other evidence supporting the ALJ's RFC determination.  *See*, *e.g.*, R. 22-23.

Based on the foregoing, the error committed by the ALJ is not harmless as the ALJ's determination that Plaintiff can perform light work, even with restrictions, is not supported by substantial evidence without further explanation by the ALJ, not the Court.  *See* Mills v. Astrue, 226 F. App'x 926 (11th Cir. 2007) (unpublished).  Stated otherwise,

although there is evidence in the record, such as Drs. Reid and Murphy's opinions and

other evidence referred to by the ALJ, *see*, *e.g.*, R. 22-23,[8] supporting the ALJ's RFC

assessment, it cannot be said that "the error was harmless without re-weighing the

evidence.  To do so would call for conjecture that invades the province of the ALJ." *Id.*

at 931-32 (citing Moore v. Barnhart, 405 F.3d at 1214 and Wilson v. Comm'r of Soc.

Sec., 378 F.3d 541, 546 (6th Cir. 2004)).

## V.  RECOMMENDATION

It is recommended that this case be remanded so that the ALJ may state and

explain the weight given to Dr. Chodosh's opinion that Plaintiff can lift and carry

occasionally and then re-consider Dr. Chodosh's opinion along with the other evidence

when re-assessing Plaintiff's RFC and ability to work at step 5 of the sequential

evaluation process.  In making this assessment, the ALJ, if appropriate, may consider

whether to re-contact Dr. Chodosh requesting him to clarify his opinion.  *See* 20 C.F.R.

§ 404.1520b(c)(1).

## VI. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge

are not based upon substantial evidence in the record and he did not correctly follow the

law.  Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny

Plaintiff's applications for Social Security benefits be **REVERSED** pursuant to sentence

four of 42 U.S.C. § 405(g) and **REMANDED** for further proceedings.

---

[8]  The ALJ considered, in part, Plaintiff daily activities, including "applying for
jobs, taking care of personal needs, preparing light meals, doing laundry,
loading/unloading dishwasher, being able to walk a mile at a time and lift 50 pounds,
driving (39 miles to the hearing), shopping and carrying groceries, managing finances,
and watching television."  R. 22 (citations omitted).

**IN CHAMBERS** at Tallahassee, Florida, on March 16, 2015.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**